**WALLING, Administrator of Wage and Hour Division, United States Department of Labor, v. LIVERNOIS.**

No. 3525.

District Court, E. D. Michigan, S. D.

June 11, 1943.

Charles A. Reynard, Regional Atty., U. S. Department of Labor, of Cleveland, Ohio, for plaintiff.

Fildew & DeGree, of Detroit, Mich., for defendant.

PICARD, District Judge.

The defendant, doing business under the assumed name of the Ohio Shale Face Brick Company, lives in Detroit but operated a brick manufacturing plant in Mansfield, Ohio. He was engaged in interstate

commerce and employed approximately 35 persons known as wheelers, setters, transfer men, shovel operators, truck drivers, general office employees, press operators and common laborers.

This action is brought by the Administrator of the Wage and Hour Division United States Department of Labor for an injunction prohibiting defendant from continuing violation of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., although at the present time, defendant is temporarily out of business because of war priorities on materials used.

It is charged that defendant worked his employees in violation of the law—that is more than 44 hours during the period from October 24, 1938, to October 23, 1939; more than 42 hours from the period of October 24, 1939, to October 23, 1940; and more than 40 hours after October 24th, 1940, without proper compensation, and that he failed to keep proper records, particularly the number of hours worked per week.

Defendant's position is that he complied with all rules and regulations of the Administrator and the letter and spirit of the law as quickly as he got to know what their meanings were—the act being new. He denies all charges and says that if there have been any violations they have now all been corrected; that he was operating in accordance with the instructions of the Administrator at the time he closed his business and that if he should again reopen the plant it would be operated in accordance with those instructions and the law. He claims that he had a contract with each of his employees guaranteeing each more per week than the minimum scale; that the employees were doing piece work and that this contract comes squarely within the purview of Walling, Adm'r v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716 decided June 8, 1942.

The position of the Administrator is that there never was any contract between defendant and his employees as contended and that even if any such contract existed, it did not comply with conditions enumerated in the Belo case, since it provided no minimum wages for the entire week—it merely provided that for the number of hours worked the employee, regardless of what he had earned through piece work, would not get less than he would have received had he been getting 37½ cents per hour each hour and not on piece work.

It appears that on September 11th, 1941, defendant contacted his employees one by one and asked each to sign a receipt for which he was given $1.00, which receipt was to the effect that the "employee" knew when he took the job back a year or two before that he was going to receive a minimum wage of 37½ cents per hour if he didn't earn that much by piece work and that this arrangement was to cover any overtime—that is, men were not to be paid any overtime.

It is the opinion of this court that if there had been any contract between this employer and his men, as outlined by him, it wouldn't have been necessary for him to call them in one by one in September, 1941, to get that admission and that it was only when he realized that the Wages and Hours Division was making a study of his records that he resorted to this means of substantiating his position. Such activity on the employer's part bears all the earmarks of "preparing one's facts".

It is hard to believe that all of these employees would state under oath that they didn't know of any such arrangement nor is it probable that practically the only employees who now substantiate defendant are those who are still working for him in his Detroit establishment or see possibilities of a return to Ohio in the event that institution open up. The fact that these men signed this receipt is not controlling on this court. Scott v. Atlas Press Co., D. C., 49 F.Supp. 260; Carleton Screw Products Co., v. Fleming, Adm'r, 8 Cir., 126 F.2d 537, 63 S.Ct. 54, 87 L.Ed. ——; Bumpus v. Continental Baking Co., 6 Cir., 124 F.2d 549, 140 A.L.R. 1258.

These men wanted their job and would probably have signed almost anything, which incidentally is one industrial evil and practice that these various social acts aim to correct. We believe that the court would have had more faith in defendant's position if he had never gotten this so-called receipt. However, whether or not the contract was entered into at the beginning of the employee's employment, we do not believe that it complies with the conditions of the Belo case because there is no guarantee of the weekly amount to be received by the employee. As we understand it, the Belo case (which had not been decided when this court decided General Mills v. Williams, 6 Cir., 132 F.2d 367, and which in effect reversed this court in Gen-

eral Mills v. Williams) turned as it did on the theory that the court will uphold such a contract between employer and employee, as many workers prefer an assured weekly income if possible as long as that income is above the minimum and complies with the hours provision of the act. This is on the theory that otherwise their incomes would fluctuate from one week to another and would continue uncertain. In the Belo case [316 U.S. 624, 62 S.Ct. 1229, 86 L.Ed. 1716] the court said this:

"Many such employees value the security of a regular weekly income. They want to operate on a family budget, to make commitments for payments on homes and automobiles and insurance."

And in the very well reasoned case of Scott v. Atlas Press Co., supra [49 F.Supp. 261], decided by our associate, Judge Raymond of the Western District, the impress of the court is again laid upon the guaranty of a set weekly income because there the court says: "In the instant case, there is no guaranty of payment of an agreed weekly wage at a fixed amount, but only an agreement that for the hours actually worked an agreed rate will be paid".

■ There is also the claim made by the administrator that adequate records were not kept. The act anticipates a weekly pay and therefore, in order for the government to adequately police this law, it is necessary that it be able to do so with the minimum of consumed time. Here the records were kept on a semi monthly basis and so adjusted. A man might work 70 hours one week and 14 hours the next. As a matter of fact, there were some instances of between 60 and 70 hours worked in one week. These records require that the department spend considerable time in determining just how many hours the employee worked during each week. Of course this was possible but the insistence of the Administrator upon a weekly record that could be easily checked is understandable and should have been corrected much sooner by the defendant as we are now informed it has been.

This court is convinced that the defendant did violate the law. What the effect would be in dollars and cents to these employees we don't know nor is it the province of this court to determine. The only question remaining for us is whether or not there should now be an injunction issued against defendant.

The administrator has just furnished us with the decision of Walling, Adm'r, etc., v. Haile Gold Mines, Inc., 136 F.2d 102, decided May 28, 1943, by the 4th Circuit Court of Appeals, as authority for this court to exercise its discretion in favor of an injunction. There injunction was granted because of the possibility of defendant Haile returning to the production of gold and to a renewal of past violations. In the Haile case, however, the question is much different from the case at bar. Haile continued his practice right up to the time suit was started and there evidently has never been a change of heart on his part. At least there is nothing in the record to so indicate. Here the defendant had already been complying with the order of the Administrator before suit was started and there might easily have existed a difference of opinion on the law governing contracts such as defendant Livernois claimed.

■ We do not believe in government by injunction to begin with nor do we believe that there is evidence of prospective further violation if this defendant returns to the business of manufacturing bricks. Where such a probability does not exist there is no need of an injunction. Fleming v. Phipps, D.C., 35 F.Supp. 627; Fleming v. National Bank of Commerce of Charleston, D.C., 41 F.Supp. 833; Walling v. Woodruff, D.C., 49 F.Supp. 52; Walling v. Builders' Veneer & Woodwork Co., D.C., 45 F.Supp. 808.

Nor can we see where an injunction is going to help. If this defendant were to renew his activities upon returning to business it appears to this court the proper action would not be one of contempt (such as might be called for under the violations of an injunction) but ought to be of a criminal nature. All an injunction does in a case of this kind is to restrain defendant from breaking the law. If he does break it you have to prove your case anyway. Here we do not anticipate he will be guilty of any further violation. If he does he can be brought before the court in at least one of two manners.

While we appreciate that hostility of some employers towards a fair interpretation of the Wages and Hours Act is exasperating to those whose duty it is to enforce the law, nevertheless such persons have their rights in court and have the right to their views—which may not always coincide with those of the Administrator.

For exercising that right they should have at least an opportunity to be heard and not be punished by a continuing injunction if there is no indication that they threaten to continue those violations.